# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

2/13/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ BM _____ DEPUTY

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.      2:21-mj-00779 -DUTY |
| THE PREMISES LOCATED AT: | ) | |
| 1631 Irvine Avenue, Unit C, Costa Mesa, California 92627 | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 111(a)(1), 2 | Assaulting, Resisting or Impeding Officers and Aiding and Abetting |
| 18 U.S.C. §§ 231(a)(3), 2 | Civil Disorders and Aiding and Abetting |
| 18 U.S.C. § 1512(c)(2) | Obstructing an Official Proceeding |
| 18 U.S.C. § 1752(a)(1) | Entering and Remaining on Restricted Buildings or Grounds |
| 40 U.S.C. § 5104(e)(2) | Violent Entry or Disorderly Conduct |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Daniel Dales

_____
*Applicant's signature*

Daniel Dales, FBI Special Agent

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      February 13, 2021

_____
*Judge's signature*

City and state: Los Angeles, CA

Honorable Jean Rosenbluth

_____
*Printed name and title*

AUSA: Ali Moghaddas

**ATTACHMENT A-1**

RESIDENCE TO BE SEARCHED

The SUBJECT RESIDENCE is located at 1631 Irvine Avenue, Unit C, Costa Mesa, California 92627.  The SUBJECT RESIDENCE is a single unit townhouse adjacent to another townhouse located within a multi-unit complex containing three standalone buildings.  The SUBJECT RESIDENCE is within the middle building and on the right when facing the front door.  The front door is brown with white trim and has stained glass to the right of the door.  The door displays a "C" on the center.

The SUBJECT RESIDENCE includes all guesthouses, annexes, attics, porches, garages, carports, driveways, outside yard (including all sheds or storage space), mailboxes, trash containers, and debris boxes that are assigned to the SUBJECT RESIDENCE.  The SUBJECT RESIDENCE also includes all vehicles, parked in the garage of the SUBJECT RESIDENCE.

 

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 111(a)(1), § 2 (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2  (Civil Disorders and Aiding and Abetting); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) (collectively, the "Subject Offenses"), namely:

a.   Evidence concerning any plans to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b.   Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c.   Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d.   Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e.    Evidence relating to any conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.    Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.    Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.    Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties at the United States Capitol on January 6, 2021;

i.    Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.    Evidence of any conspiracy, planning, or preparation to commit the Subject Offenses;

k.    Evidence concerning efforts after the fact to conceal evidence of the Subject Offenses, or to flee prosecution for the same;

l.    Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law enforcement, such as pepper spray or smoke grenades;

m.   Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.   Evidence of the state of mind of SECOR and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the Subject Offenses and/or the riot and civil disorder that occurred at the United States Capitol on January 6, 2021;

o.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation, including the Subject Offenses; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including the Subject Offenses, such as records that help reveal their whereabouts;

p.   Records, materials, and information that constitute evidence of identity, including but not limited to:

i.   clothing worn by SECOR, including a red hat which displays "Make America Great Again" in white, a black jacket, black gloves, a black t-shirt which displays "Weimerica" in white with a red, white, and blue flag; and

ii.  clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including a blue flag displaying "America First" and evidence of pepper spray or other non-lethal crowd control remnants;

q.  Records and information — including but not limited to documents, communications, e-mails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements — relating to:

i.  Any records and/or evidence revealing SECOR's presence at the January 6, 2021, Capitol Riots;

ii.  Any physical records, such as receipts for travel, which may serve to prove evidence of travel to or from Washington D.C. from December of 2020 through January of 2021;

iii. SECOR's (and others's) motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

iv.  SECOR's (and others's) activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021;

r.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

s.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.   evidence of the times the device was used;

       vi.  evidence of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

       vii. evidence of SECOR's use or connection to social media accounts;

       viii.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

       ix.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

    x. records of or information about Internet
Protocol addresses used by the device;

    xi. records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

  3. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

    ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

   d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress CHRISTIAN ALEXANDER SECOR's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of CHRISTIAN ALEXANDER SECOR's face with his eyes open to activate the facial-, iris-, or retina-

x

recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Daniel Dales, being duly sworn, declare and state as follows:

**I.   INTRODUCTION**

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2017. I am currently assigned to the Los Angeles Field Office's Long Beach Resident Agency Joint Terrorism Task Force.  My duties include investigating violations of the laws of the United States, specifically investigations related to domestic and foreign terrorism.  As a Special Agent, I have received both formal and informal training from the FBI regarding domestic and foreign terrorism investigations.

2.   Through my training and experience with the FBI, I am familiar with the methods of operation that individuals associated with domestic and foreign terrorist organizations employ – including their use of social media and online platforms such as Facebook, Instagram, and YouTube – to communicate with associates regarding their ideology, to organize actions on behalf of their organizations, and to bring attention to their political and social agendas.  As an FBI Special Agent, I have also participated in the execution of multiple search warrants, including search warrants executed at physical residences in cases involving domestic terrorism.

**II. PURPOSE OF AFFIDAVIT**

3.   This affidavit is made in support of warrants to search: (1) 1631 Irvine Avenue, Unit C, Costa Mesa, California

92627 (the "SUBJECT RESIDENCE"), as described more fully in Attachment A-1, which is incorporated herein by reference; (2) the person of CHRISTIAN ALEXANDER SECOR ("SECOR"), as described more fully in Attachment A-2, which is incorporated herein by reference; and (3) a black 2016 Subaru Outback bearing California license plate number 7SFB812, as described more fully in Attachment A-3, which is incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference: 18 U.S.C. § 111(a)(1), § 2 (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) (collectively, the "Subject Offenses").

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

### III.  **SUMMARY OF PROBABLE CAUSE**

5.    SECOR is an Orange County resident and student at University of California Los Angeles ("UCLA").  On January 6, 2021, SECOR was part of a violent mob that rioted at the United States Capitol in Washington D.C. while a joint session of Congress met to certify the results of the 2020 Presidential Election.

6.    SECOR was captured in dozens of photographs and videos recorded inside the Capitol building on January 6, 2021.  In one video, broadcast by MSNBC, SECOR was recorded sitting in the Chair of the Presiding Officer of the United States Senate.

7.    On February 13, 2021, the Honorable Zia M. Faruqui, United States Magistrate Judge in the District of Columbia, issued a criminal complaint and arrest warrant charging SECOR with 18 U.S.C. § 111(a)(1), § 2 (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorder and Aiding and Abetting); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding), 18 U.S.C. § 1752(a)(1) and (2) (Entering and Remaining on Restricted Building or Grounds), and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct).  The criminal complaint, arrest warrant, and affidavit in support thereof are attached hereto as Exhibit A and incorporated herein by reference.

8.    As detailed below, there is probable cause to believe that SECOR lives at the SUBJECT RESIDENCE, drives the SUBJECT VEHICLE, and that additional evidence of the Subject Offenses –

including items and digital device(s) used by SECOR during the
riot at the U.S. Capitol – will be found inside.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   SECOR's Presence at the Riot

9.   After the January 6, 2021 riot at the Capitol, the FBI
received tens of thousands of tips from the public.  Many of
these tipsters contacted the FBI to report persons who were
present at the riot.  The FBI received at least 11 individual
tips identifying SECOR as an individual inside the U.S. Capitol
Building during the Capitol riot.

10.   On February 13, 2021, in the District of Columbia,
SECOR was charged by complaint with 18 U.S.C. § 111(a)(1), § 2
(Assaulting, Resisting or Impeding Officers and Aiding and
Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorder and Aiding
and Abetting); 18 U.S.C. § 1512(c)(2) (Obstructing an Official
Proceeding), 18 U.S.C. § 1752(a)(1) and (2) (Entering and
Remaining on Restricted Building or Grounds), and 40 U.S.C. §
5104(e)(2) (Violent Entry or Disorderly Conduct).  See Exhibit
A.  By way of summary, the affidavit in support of the criminal
complaint sets forth the following facts, among others:

        a.   Between approximately January 17 and January 22,
2021, the FBI reviewed media sent to the FBI media submission
portal and/or FBI tipline for the U.S. Capitol riot from at
least 11 individual tipsters who identified SECOR inside the
U.S. Capitol Building, both standing on the floor of the Senate
chamber, and sitting in the Chair of the Presiding Officer on
the upper tier of the two-tiered dais at the head of the Senate

4

chamber -- a seat that is normally occupied by either the Vice President of the United States and President of the Senate, the President Pro Tempore, or another Senator from the majority party who acts as the Presiding Officer (Ex. A at ¶ 14);

b.   One tipster stated, among other things, that SECOR is a UCLA undergraduate student and the President of the "America First Bruins."  The tipster stated that SECOR defines himself as a fascist, and that he has posted threats online and openly posted calls for America to become a whites-only nation (id. at ¶ 24);

c.   In one of the videos provided by the U.S. Capitol Police, SECOR can be seen among a group of rioters attempting to push through a doorway that is blocked by no less than three police officers, thereby impeding a federal officer in the performance of their duties, and breaking through a police line (id. at ¶ 18); and

d.   As a result of SECOR and others pushing on the double doors in the Capitol, the doors were opened from the inside, allowing dozens of additional rioters to come flooding into the building.  The Capitol Police officers guarding the double doors were shoved by the crowd, at times trapped between the doors and the crowd, and eventually pushed out of the way of the oncoming mob (id. at ¶ 19).

**B.   SECOR Resides at the SUBJECT RESIDENCE and Drives the SUBJECT VEHICLE**

11.   According to California Department of Motor Vehicles records, SECOR resides at 1631 Irvine Avenue, Unit C, Costa

Mesa, California 92627.  Based on basic Internet research and information provided by an FBI surveillance team, I know that this address corresponds to a townhouse within a multi-unit complex.  Further, based on a government database records check, I know that SECOR, as well as his mother, L.S., and sister, I.S., are associated with this address.  This address is described herein and within Attachment A-1 as the SUBJECT RESIDENCE.

12.  On January 25, 2021, an FBI surveillance team observed SECOR at the SUBJECT RESIDENCE.  Specifically, members of the surveillance team watched SECOR exit the SUBJECT RESIDENCE and depart in a black 2016 Subaru Outback bearing California license plate number 7SFB812.  This car is described herein and within Attachment A-3 as the SUBJECT VEHICLE.  The SUBJECT VEHICLE is registered to SECOR's father, N.S.

13.  On January 27, 2021, an FBI surveillance team again observed SECOR exit the SUBJECT RESIDENCE and depart in the SUBJECT VEHICLE.



14.   On January 28, 2021, an FBI surveillance team observed SECOR exit the SUBJECT RESIDENCE, enter the SUBJECT VEHICLE, and drive to a nearby park where SECOR met with a friend.

15.   Again, on February 7, 2021, at approximately 8:00 a.m., an FBI surveillance team observed SECOR exit the SUBJECT RESIDENCE, get into a car driven by an unidentified individual, and depart.

C.   **USE OF DIGITAL DEVICES AT THE CAPITOL RIOTS**

16.   Based on my training and experience, I know that individuals traveling outside of their cities of residence to attend large events, such as the demonstration on January 6, 2021 in Washington D.C., typically carry their cell phones with them in order to coordinate their travel plans, use web-based applications to get directions to unfamiliar locations, and communicate with friends and family both at the event and at

home.  Furthermore, based on my training and experience, I know that persons who engage in the Subject Offenses will frequently use digital devices, including cell phones, computers, tablets, and other devices, to conduct their criminal activities, take (and store) photographs and videos in order to memorialize their illegal activities, and maintain contact with others involved with the planning, targeting, and execution of the Subject Offenses.

17.  In my training and experience, I know that smart phones are the single most common way in which people now take photographs and instantly share them with others.  As detailed below, in my training and experience, camera and messaging applications on smart phones allow users to take photographs and video- such as those that were taken during the Capitol Riots - and communicate with other users.

18.  Based on my review of public news reports following the events at the U.S. Capitol on January 6, 2021, I know that many individuals involved in the incident used their cell phones to take photographs and videos, as well as to share them on social media applications, both during and after the incident. According to government and open source databases, SECOR previously maintained accounts on multiple social media applications, including DLive, Facebook, Twitter, Skype, and WhatsApp.  I know, based on my training and experience, that these Internet-based applications require digital devices to operate and that photographs and videos that are posted to social media are also generally stored on the digital devices

themselves.  Such evidence is therefore likely to be found on
the digital devices used by SECOR.  These devices are also
likely to have other evidence of SECOR's activities, including
evidence of his location in the hours and days leading up to and
after the Capitol Riots, Internet searches he conducted
regarding the riots, and communications with other individuals
regarding the riots.  These devices are also likely to have
other evidence of the commission of the Subject Offenses by
other rioters who were near SECOR while SECOR recorded
activities at and near the Capitol.

    19.  Based on my training and experience, I know that
individuals typically store their digital devices, such as cell
phones, tablets, and computers, at their personal residences,
vehicles, and/or on their persons, where the devices can be
easily accessed and used.  Moreover, in this case, on January 6,
2021, SECOR wore uniquely identifiable clothing, i.e., a red hat
which displays "Make America Great Again" in white, a black
jacket, black gloves, a black t-shirt which displays "Weimerica"
in white with a red, white, and blue flag, and was carrying a
blue flag displaying "America First."  In my training and
experience, individuals who engage in interstate travel to riot
and damage federal property often return to their homes with the
same clothing/items that they wore/used when they committed the
offenses.  These items can prove that the individual shown in
images captured on social media during a riot is the same person
who lives at a given residence or used a particular item during
the riot.

20.  In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on SECOR's cell phone(s) may also be saved to other digital devices.  Moreover, as widely reported in the news media, many individuals committing the Subject Offenses posted videos, photos, and commentary about their participation in the Capitol Riots, essentially bragging about their involvement.  Based on that, there is also probable cause to believe that evidence related to these offenses may have been transferred to and stored on digital devices beyond the particular digital device SECOR possessed during the riot.

21.  Accordingly, I believe that evidence of the Subject Offenses, including digital devices and other items used by SECOR to prepare for, commit, document, and discuss the Subject Offenses, are likely to be found on SECOR's person, inside the SUBJECT RESIDENCE, and within the SUBJECT VEHICLE.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;
                              *(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remains on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    24.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

        a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

13

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHRISTIAN ALEXANDER SECOR's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of CHRISTIAN ALEXANDER SECOR's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VI. CONCLUSION

25. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 111(a)(1), § 2 (Assaulting, Resisting or Impeding Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorders and Aiding and Abetting); 18 U.S.C. § 1512(c)(2) (Obstructing an Official Proceeding); 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry or Disorderly Conduct) will be found at the SUBJECT RESIDENCE, on

the person of SECOR, and within the SUBJECT VEHICLE, as

described in Attachments A-1 through A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 13th day of
February, 2021.


_____
HONORABLE JEAN ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

15

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No:** |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **CHRISTIAN SECOR,** | : | **18 U.S.C. § 111(a)(1), § 2** |
| | : | **(Assaulting, Resisting or Impeding Officers** |
| **Defendant.** | : | **and Aiding and Abetting)** |
| | : | |
| | : | **18 U.S.C. § 231(a)(3), § 2** |
| | : | **(Civil Disorder and Aiding and Abetting)** |
| | : | |
| | : | **18 U.S.C. § 1512(c)(2)** |
| | : | **(Obstructing an Official Proceeding)** |
| | : | |
| | : | **18 U.S.C. § 1752(a)(1) and (2)** |
| | : | **(Entering and Remaining on Restricted** |
| | : | **Building or Grounds)** |
| | : | |
| | : | **40 U.S.C. § 5104(e)(2)** |
| | : | **(Violent Entry or Disorderly Conduct)** |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Benjamin A. Elliott, being first duly sworn, hereby depose and state as follows:

## PURPOSE OF AFFIDAVIT

1.    This Affidavit is submitted in support of a Criminal Complaint charging

CHRISTIAN SECOR with criminal conduct in connection with the riots at the U.S. Capitol on

January 6, 2021.  As set forth herein, I respectfully submit that this affidavit establishes probable

cause that SECOR committed violations of 18 U.S.C. § 111, § 2 (Assaulting, Resisting or Impeding

Officers and Aiding and Abetting); 18 U.S.C. § 231(a)(3), § 2 (Civil Disorder and Aiding and

Abetting); 18 U.S.C. § 1512 (Obstruction), 18 U.S.C. § 1752(a)(1) and (2) (Restricted Building or

Grounds), and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct).

1

## BACKGROUND OF AFFIANT

2.      Your affiant is employed as a Special Agent at the Federal Bureau of Investigation (FBI), and has been so employed since December 21, 2020. Currently, I am assisting in the investigation of criminal activity in and around the Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws.

3.      Unless otherwise stated, the information in this Affidavit is either personally known to me, has been provided to me by other individuals, or is based on a review of various documents, records, and reports.  Because this Affidavit is submitted for the limited purpose of establishing probable cause to support an application for an arrest warrant, it does not contain every fact known by me or the United States.  The dates listed in this Affidavit should be read as "on or about" dates.

## PROBABLE CAUSE

### The Incursion at the Capitol

4.      The United States Presidential Election occurred on November 3, 2020.

5.      The United States Electoral College is a group required by the Constitution to form every four years for the sole purpose of electing the president and vice president, with each state appointing its own electors in a number equal to the size of that state's Congressional delegation.

6.      On December 14, 2020, the presidential electors of the U.S. Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the 2020 U.S. Presidential Election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won the sufficient votes to be elected the next president and vice president of the United States.

7.      On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened in the United States Capitol building ("the Capitol") to

certify the vote of the Electoral College of the 2020 U.S. Presidential Election ("Electoral College vote").

8.      The United States Capitol is secured 24 hours a day by United States Capitol Police ("Capitol Police"). The Capitol Police maintain permanent and temporary barriers to restrict access to the Capitol exterior, and only authorized individuals with appropriate identification are allowed inside the Capitol building. The entire Capitol complex—including the Capitol building, the Capitol Visitor Center, and Capitol grounds to include the entire exterior plaza—was barricaded and off limits to the public on January 6, 2021

9.      On January 6, 2021, at approximately 1:00 p.m., the Joint Session convened in the Capitol building to certify the Electoral College vote. Vice President Michael R. Pence, in his constitutional duty as President of the Senate, presided over the Joint Session. Vice-President-Elect Kamala D. Harris, in her role as a Senator representing the State of California, was also present.

10.     A large crowd began to gather outside the Capitol perimeter as the Joint Session got underway. Crowd members eventually forced their way through, up, and over Capitol Police barricades and advanced to the building's exterior façade. Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured. Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building by breaking windows, ramming open doors, and assaulting Capitol Police officers. Other crowd members encouraged and otherwise assisted the forced entry. The crowd was not lawfully authorized to enter or remain inside the Capitol, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other security officials.

11.     Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate (including Vice President Pence and Vice-President Elect Harris)—who had withdrawn to separate

chambers to resolve an objection—were evacuated from their respective chambers. The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law enforcement officers worked to restore order and clear the Capitol of the unlawful occupants.

12.     Later that night, law enforcement regained control of the Capitol. At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, and attended by Vice-President-Elect Harris, both of whom had remained within the Capitol building throughout these events.

13.     In the course of these events, approximately 81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted. Additionally, one subject was shot and killed while attempting to enter the House chamber through broken windows; many media members were assaulted and had cameras and other news gathering equipment destroyed; and the Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order.

*SECOR's Participation in the U.S. Capitol Incursion*

14.     Between approximately January 17 and January 22, 2021, the FBI reviewed media sent to the FBI media submission portal and/or FBI tipline for the U.S. Capitol Incident from at least 11 individual tipsters who identified Christian Alexander SECOR as a person who illegally entered the U.S. Capitol building January 6, 2021.  These tipsters provided images and videos of SECOR inside the U.S. Capitol Building, both standing on the floor of the Senate chamber, and sitting in the Chair of the Presiding Officer on the upper tier of the two-tiered dais at the head of the Senate chamber.  This seat is normally occupied by either the Vice President of the United States and President of the Senate, the President Pro Tempore, or another Senator acting as the

Presiding Officer.  These images were widely circulated via both mainstream news outlets and on social media platforms.

15.     In the media submitted by individual tipsters and reviewed by your affiant, the subject later identified as SECOR can be seen wearing a red Make America Great Again hat with several stickers, including a blue circle with letters AF in white writing on the bill, a black jacket, black gloves, tan pants, and a T-shirt with an adulterated American flag and the letters "IMER" visible in white writing. The subject is also carrying a large blue flag with "America First" in white writing attached to a white pole. See Figures 1-4 below.



*Figure 1*







*Figure 1*                                                                *Figure 2*



Pictured below is self-described Groyper, Christian Secor, who also goes by "Scuffed Elliot Rodger." Here you can see him on the senate floor, carrying an "America First" flag. You can just barely see the ARCTERYX logo on his jacket. #CapitolRiots 1/

8:59 PM · Jan 15, 2021 · Twitter for iPhone

52 Retweets   17 Quote Tweets   87 Likes



*Figure 3*[1]

16.     Your affiant reviewed a video filmed by The New Yorker magazine and aired on

---

[1] Figure 4 describes SECOR as a "Groyper." The Groypers are a network of alt right figures who are vocal supporters of white supremacist and "America First" podcaster Nick Fuentes.

MSNBC, showing individuals on the floor of the Senate chamber during the riot. The video shows
SECOR sitting in the Chair of the Presiding Officer which had been occupied by the Vice President
during the Senate proceedings earlier that day. Figure 5 (below) is a screenshot from the video
showing SECOR in the Presiding Officer's chair, with what appears to be a blue America First flag
propped against the wall behind his left shoulder.[2]



*Figure 4*

17.    The U.S. Capitol Police provided the FBI with videos and images from CCTV
cameras inside of the Capitol building showing SECOR in various parts of the building, including
the H227 Hallway (Figure 6), East Corridor near S306 (Figure 7), Senate Gallery SE near S309
(Figure 8), H230 Hallway (Figure 9), Rotunda Door Interior (Figure 10), and the Gallery Stairs
(Figure 11). Figures 6 through 11 are screenshots from the CCTV videos. In each of these videos,

---

[2] The link to the original video can be found at https://www.newyorker.com/news/video-
dept/a-reportersfootage-from-inside-the-capitol-siege. SECOR appears at approximately 4:25.

SECOR appears to be carrying the same blue America First flag.



*Figure 6 – H227 Hallway*



*Figure 7 - East Corridor near S306*



*Figure 8 - Senate Gallery SE near S309*



*Figure 9 - H230 Hallway*



*Figure 10 - Rotunda Door Interior*



*Figure 11 - Gallery Stairs*

18.     In one of the videos provided by the U.S. Capitol Police, SECOR can be seen among

a group of rioters attempting to push through a doorway that is blocked by no less than three police

officers, thereby impeding an the performance of their duties, and breaking through a police line.

Figure 12 is a screen capture from that video showing SECOR and the crowd pressing against the officers as they try to block the doorway.



*Figure 12*

19.     As a result of SECOR and others pushing on the double doors depicted in Figure 12, the doors opened, and dozens of additional rioters flooded into the building. The Capitol Police officers were shoved by the crowd, at times trapped between the doors and the crowd, and eventually pushed out of the way of the oncoming mob. Law enforcement's efforts to keep out the additional rioters were frustrated by the crowd inside pushing on the doors, including SECOR.

*Identification of SECOR*

20.     Several individuals submitted information to the FBI about SECOR's presence at the U.S. Capitol on January 6, 2021. The tipster, a current student at UCLA, submitted the image in Figure 1 (above), which they obtained from Twitter.  The tipster identified the individual depicted as Christian SECOR, a UCLA student and founder of the campus organization "America First Bruins."

21.     Another individual submitted the images in Figure 2 and Figure 3 (above), which were also copied from Twitter.  The tipster also identified the person depicted as "Christian SECOR, aka "Scuffed Elliott Roger," a UCLA undergrad and member of America First Bruins and other Bruins Republican organizations that supported the U.S. Capitol riot on social media.

22.     A third tipster submitted a screenshot of a post on Twitter (Figure 4, above).  This individual stated the person pictured is Christian SECOR, who also goes by "Scuffed Elliot Rodger."

23.     The FBI conducted an open source search to locate and verify posts by the Twitter user mentioned by the tipsters.  The Twitter user provided pictures of SECOR at a rally in Huntington Beach, California and compared these photographs to those from the U.S. Capitol riots, identifying SECOR. See Figures 13 & 14, below.



*Figure 13*



Pictured below is self-described Groyper, Christian Secor, who also goes by "Scuffed Elliot Rodger." Here you can see him on the senate floor, carrying an "America First" flag. You can just barely see the ARCTERYX logo on his jacket. #CapitolRiots 1/

5:59 PM · Jan 15, 2021 · Twitter for iPhone

**53** Retweets  **18** Quote Tweets  **91** Likes

*Figure 14*

24.     A fourth individual submitted the video filmed by The New Yorker, mentioned above at Figure 5. This individual also provided the following information:

    a.   The video shows Christian SECOR invading and occupying the U.S. Capitol, and sitting in "the Speakers Chair;"

    b.   SECOR is a UCLA undergraduate student and the President of the "America First Bruins;"

    c.   SECOR defines himself as a fascist;

    d.   SECOR has posted threats online and openly posted calls for America to become a whites-only nation.

25.     On January 25, 2021, the FBI Los Angeles Field Office interviewed the fourth tipster, who knows SECOR as a University of California Los Angeles student.  SECOR is well-known for his participation in the organization America First Bruins.  The tipster identified SECOR in a photograph provided by law enforcement (see Figure 15, below) based on their knowledge of

SECOR's appearance in or about January 2021.  SECOR is known to follow an extreme ideology and invite white nationalists to speak at engagements on campus.

      26.    On January 25, 2021, the FBI Los Angeles Field Office interviewed a fifth individual, who personally knows SECOR. The tipster was shown a picture (see Figure 15, below) and a video of SECOR on the floor of the Senate chamber at the U.S. Capitol, and confirmed his identity through their personal knowledge of SECOR's appearance in or about January 2021. According to this individual, upon returning from Washington D.C., SECOR moved back in with his mother in Costa Mesa, California.  SECOR got rid of his phone and car and bragged that he would not be caught for his involvement at the U.S. Capitol.



*Figure 15 – Tipsters 4 and 5 identified SECOR in this picture when interviewed by the FBI*

      27.    The FBI used database searches, open source searches (i.e., Internet searches), witness interviews, physical surveillance, and reporting from another law enforcement agency to independently confirm SECOR's identity, and to verify other information provided to the FBI tip

line. Your affiant compared a copy of SECOR's California driver's license photograph to the photographs above—based on your Affiant's review of the photographs, they appear to be the same person.

28.     In addition to the above steps taken to identify SECOR, law enforcement conducted surveillance of SECOR between January 25 and 28, 2021, observing him exit his mother's California residence and drive a vehicle registered to his father. Based on that surveillance, law enforcement agents confirmed that SECOR appears to be the person in the photographs inside the Capitol above.

*Ties to Extremist Groups*

29.     The FBI conducted an open source search and located posts by a Twitter user who posted screenshots from March 2020 of a Twitter account, @fullautonat, verified as belonging to SECOR. One screenshot shows the Twitter account for America First Bruins, listing @fullautonat, SECOR's Twitter handle, as President. See Figure 16 below.

30.     America First is a podcast founded by Person 1, a public figure known for making racist statements and denying the holocaust. Open source information revealed a tweet by SECOR's Twitter account, @fullautonat, in which SECOR is posing shaking hands with Personn 1. See Figure 17 below. The screenshot of this tweet shows that the vanity name associated with the account is "Christian 'Laser Eyes' Secor."



*Figure 16*



Kinda epic doe?



*Figure 17*

18

31.     The FBI located additional information linking SECOR to the America First Bruins. Figure 18 shows UCLA student organization registry information for America First Bruins club, which lists SECOR as primary signatory. America First Bruins, and the Bruins Republicans, are well-known clubs on campus and SECOR is widely known by his association with both.



*Figure 18*

32.     The FBI conducted an open source search and located an article dated April 1, 2020, which features a series of screenshots from SECOR's Twitter account @fullautonat.[3]   In these posts, SECOR describes fascism as "epic;" valorizes the 2017 Charlottesville tiki torch march, which featured chants of "Jews will not <u>replace</u> us!;" encouraged followers to watch Person 1 "highlights;" states that he supports "nationalism everywhere;" and suggests Jews and the state of

---

[3] *See* https://haam.org/disloyal-fascists-come-to-ucla/.

Israel control the politics of other governments and attempt to influence "Westerners."

33.     The FBI conducted an open source search and located an article entitled, "Here's the Nazis Who Toppled The Monolith."[4] In this article, posted January 8, 2021, SECOR was found to be active on DLive, a video live-streaming service built on blockchain technology used by other defendants at the Capitol riot, under the alias "Scuffed Elliot Rodger." This alias is believed to be a reference to the 2014 Isla Vista Mass Murderer and University of California, Santa Barbara student who fatally stabbed his three roommates. This article shows a photo of SECOR with a person identified as Person 2, aka "CultureWarCriminal," posing in front of a wooden cross. Person 2 is widely reported to be a member of the Groypers.

## CONCLUSIONS OF AFFIANT

34.     Based on the foregoing, your affiant submits that there is probable cause to believe that SECOR violated:

    e.   18 U.S.C. § 111, § 2, which makes it unlawful to forcibly assault, resist, oppose, impede, intimidate, or interfere with any officer or employee of the United States while engaged in or on account of the performance of official duties and aid and abet others known and unknown to do the same;

    f.   18 U.S.C. § 231(a)(3), § 2, which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity

---

[4] *See* https://leftcoastrightwatch.org/2021/01/heres-the-nazis-who-toppled-that-monolith/.

in commerce or the conduct or performance of any federally protected function, and aid and abet others known and unknown to do the same. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes;

g.  18 U.S.C. § 1512(c)(2), which makes it a crime to obstruct, influence, or impede any official proceeding, or attempt to do so. Under 18 U.S.C. § 1515, congressional proceedings are official proceedings;

h.  18 U.S.C. § 1752(a)(1) and (2), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do so; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions.  For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

i.  40 U.S.C. § 5104(e)(2)(A), (B), (C), (D), and (G), which makes it a crime to willfully

21

and knowingly (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of— (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of  Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

35.    As such, I respectfully request that the court issue an arrest warrant for SECOR.

The statements above are true and accurate to the best of my knowledge and belief.

_____

SPECIAL AGENT BENJAMIN A. ELLIOTT
FEDERAL BUREAU OF INVESTIGATION


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 13th day of February, 2021.

2021.02.13
09:40:56 -05'00'

_____

ZIA M. FARUQUI
U.S. MAGISTRATE JUDGE